IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DARBY JORDAN, | } |
| Plaintiff, | } |
| VS. | } CIVIL ACTION NO. H-06-2269 |
| MEMORIAL HERMANN SOUTHEAST HOSPITAL and MEMORIAL HERMANN HEALTHCARE SYSTEM, | } |
| Defendants. | } |

**OPINION & ORDER**

Pending before the court in this employment discrimination case is Defendants Memorial Hermann Southeast Hospital and Memorial Hermann Healthcare System's (collectively "Memorial Hermann's") motion for summary judgment (Doc. 10). Plaintiff Darby Jordan ("Jordan") has filed a response (Doc. 14), and Memorial Hermann has replied (Doc. 15). Jordan has also filed a sur-reply (Doc. 16). For the reasons explained below, the court ORDERS that Memorial Hermann's motion is GRANTED.

I.    Background and Relevant Facts

In 1982, Memorial Herman hired Jordan as a Security Officer at its Southwest Hospital. As a Security Officer, Jordan's responsibilities included, *inter alia*, dispatch duty, emergency room duty, foot patrol, and motor patrol. (Jordan Dep. 21).[1] A security officer on dispatch duty monitors all radio transmissions at Memorial Hermann's community center. (*Id.* at 21-22). A security officer on emergency room duty monitors the emergency room. (*Id.* at 22-23).

---

[1] Both Memorial Hermann and Jordan have attached Jordan's deposition testimony as summary judgment evidence. (*See* Doc. 10 Ex. A and Doc. 14 Ex. A respectively). Because Jordan offers a complete version of Jordan's deposition, all references to this testimony shall be to Doc. 14 Ex. A.

A security officer on foot and motor patrol makes rounds inside and outside the hospital and in the parking lots respectively. (*Id.* at 22).

Thereafter, Jordan was promoted to a Security Officer II position at the hospital.[2] The basic functions of a Security Officer II is to protect, secure, and promote safety and security on Memorial Hermann's grounds, parking lots, and buildings. (Jordan Dep. Ex. 6, Doc. 10 Ex. A). Jordan testified that he did not consider it a real promotion because his salary did not increase. (Jordan Dep. 46).

In 2003, Memorial Herman hired Tony Cross ("Cross") as the manager of the security department at the hospital. As a result, Cross became Jordan's direct supervisor. (Cross Aff. ¶¶ 2-3, Doc. 10 Ex. B).

On July 30, 2003, Cross assigned Jordan third shift supervisor responsibilities. (*Id.* ¶ 3; Jordan Dep. 48). "Third shift" refers to the 10:30 p.m. to 7:00 a.m. shift period. As a third shift supervisor, Jordan controlled the scheduling and posting of security personnel on the third shift. (*See* Shift Supervisor Responsibilities, Jordan Dep. Ex. 7, Doc. 10 Ex. A). Jordan testified that he neither requested nor desired the increased responsibilities. (Jordan Dep. 49). Jordan did not consider the assignment a promotion. (*Id.*)

In October 2003, Jordan, along with several other security officers, filed a complaint against Cross with John Houchin ("Houchin"), Memorial Hermann's Assistant Vice-President of the Security Department. (*See id.* at 59-60). Immediately prior to the filing of the complaint, Cross had begun making sporadic visits to the hospital to monitor the security officers' performance on the third shift. (Cross Aff. ¶ 4, Doc. 10 Ex. B). On one occasion, Cross discovered that some of the security officers were not at their assigned posts and that one officer was sleeping on the job in the

---

[2] The record is ambiguous as to the exact date of Jordan's promotion. Memorial Hermann, in its briefing, claims a promotion date "[i]n or around 2001." (Defs.' Mot. Summ. J. 3, Doc. 10). The "Security Officer II Position Description" (Jordan Dep. Ex. 6, Doc. 10 Ex. A) is dated October 1, 2000, but signed by Jordan on September 7, 2004. In his deposition testimony, Jordan acknowledges that he was promoted in 2004, "[i]f not before . . ." (Jordan Dep. 47).

-2-

guard booth. (*Id.*) Unhappy with these visits and Cross's angry response, the security officers filed their complaint. In his deposition, Jordan testified that Cross (1) called him "a cancer to the department" (Jordan Dep. 60-61); (2) stated it was just a matter of time before he (Cross) got rid of the "old-timers"(*Id.* at 64-65); (3) told him he was "not satisfied with the way things [were] being run" (*Id.* at 61-62); and (4) showed up during shifts using a "military tone, yelling at people" (*Id.* at 62-63). In his written complaint to Houchin, Jordan claims that Cross called him a "slacker," who lacked control over the third shift, that Cross stated he "could have fired [Jordan]" when he fired another employee, and finally that Cross told Jordan to go ahead and file a grievance but that "he would be ready with his documentation." (Jordan Dep. Ex. 10, Doc. 10 Ex. A). Notably absent from Jordan's written complaint are any allegations regarding Cross calling Jordan a cancer to the department or stating that Cross was going to get rid of the "old-timers." Houchin investigated the complaint and found no wrongdoing by Cross. (Jordan Dep. 67).

Jordan's next complaint against Cross came several months later in early 2004. In this complaint, Jordan, again with several fellow officers, alleged that Cross created a hostile work environment and discriminated against them. (Cross Aff. ¶ 6, Doc. 10 Ex. B). Jordan claims that the basis of this complaint included Cross allegedly referring to Jordan again as a cancer to the department, calling Jordan the "last of the Mohicans," and telling Jordan that Cross was going to fire the "old-timers." (Jordan Dep. 70-71). Memorial Hermann placed Cross on leave while it investigated the complaint. (Cross Aff. ¶ 6, Doc. 10 Ex. B). Ultimately, Memorial Hermann determined that Cross had neither created a hostile work environment nor discriminated against any of the employees. (*Id.*). This 2004 complaint was the last formal complaint filed by Jordan against Cross.

From October 2003 to Jordan's resignation in July 2005, Cross and Jordan had numerous exchanges regarding Jordan's performance and behavior. On October 23, 2003, Cross questioned Jordan about Jordan's decision to go home while another security officer worked

overtime hours. (Jordan Dep. 74-75; Jordan Dep. Ex. 11, Doc. 10 Ex. A). Jordan did not, however, receive corrective action based on this incident.

In April 2004, Cross issued a verbal warning to Jordan for performance errors when Jordan failed to properly operate and care for his security patrol vehicle, which was abandoned overnight with a flat tire, and when he failed to report the incident. (Cross Aff. ¶ 7, Doc. 10 Ex. B). In response to this incident, Jordan met with Cross and Dewayne Lyke ("Lyke"), Memorial Herman's Security Department Supervisor. (Jordan Dep. 76). Jordan testified that Cross warned Jordan to watch out for the "old-timers" because they would "sell [Jordan] out." (*Id.* at 77). Jordan never reported these comments to anyone at Memorial Hermann. (*Id.*).

In July 2004, Cross issued a final written warning to Jordan regarding statements Jordan made to another Memorial Hermann employee about the theft of the employee's car. (*See* Jordan Dep. Ex. 13, Doc. 10 Ex. A). Jordan told the employee that the security staff "watched the individual steal the truck but did not do anything about it." (*Id.*). Understandably upset, the employee complained to the hospital administration. Cross investigated and determined that Jordan had made the remarks and that such remarks violated Memorial Hermann's behavior policy, which states that employees should not make inappropriate or negative comments about patients, co-workers, physicians, or any part of Memorial Hermann in the presence or within hearing of any internal or external customer. (Cross Aff. ¶ 9, Doc. 10 Ex. B). As a result, Cross issued the final written warning to Jordan. While not disputing making this statement, Jordan disagrees that a final written warning was appropriate. (*See* Jordan Dep. 78-84).

Another minor incident occurred in November 2004 when Lyke caught Jordan smoking in an unauthorized location. (*See* Jordan Dep. Ex. 14, Doc. 10 Ex. A). Jordan claims that the incident never happened. (Jordan Dep. 85-86). It is undisputed that Cross did not take any disciplinary action against Jordan for the alleged infraction. (*Id.* at 86).

A final incident occurred in July 2005 when a body was left at Memorial Hermann. (*See* Cross Aff. ¶ 8, Doc. 10 Ex. B).  The media gained unauthorized access to hospital in an effort to report the story.  (*Id.*)  Surveillance video revealed that a number of security officers allowed the media entrance to the building.  (*See id.*)  Jordan was also working that night, and Cross questioned him about the unauthorized entry onto the hospital.  (*Id.*)  Cross ultimately concluded that Jordan had not been involved in the incident and did not discipline Jordan.  (*Id.*)  According to Jordan, Cross allegedly said that he wished Jordan had been involved so that Cross could have fired him. (Jordan Dep. 98).

Jordan resigned from Memorial Hermann on July 17, 2005.  (Jordan Dep. 14-15; *see also* Jordan Email, dated July 17, 2005 (hereafter "Resignation Letter"), Doc. 14 Ex. F).  In his Resignation Letter, Jordan discussed the media incident and Cross's alleged statement about wishing it had been Jordan involved.  (Doc. 14 Ex. F).  He claimed that Cross had "belittled" and "disrespected" him.  (*Id.*)  He reiterated his prior complaint Cross referred to Jordan as a "cancer to the department" and that Cross was determined to "get rid of [him]."  (*Id.*)  Jordan also complained that Cross had cautioned co-workers that Jordan was a bad influence and that he "was not worth a damn."  (*Id.*)  Jordan further expressed his displeasure with the final written warning issued a year prior.  (*Id.*)  Finally, Jordan claimed that Cross (and Lyke) had "assassinated" his character and "created a hostile working environment."  (*Id.*)

Other comments attributed to Cross, but without a definite time frame, include (1) Cross allegedly telling the entire security department that Jordan had left early because he had a "bump on his ass" in reference to a boil on Jordan's inner thigh, which was caused by diabetes (*id.* at 88-89), (2) Cross allegedly telling Jordan that he was not a team player and questioning his responsibility as a father (*id.* at 98-99), and (3) Cross allegedly commenting that he did not think Jordan would be able to handle his job because of his age and/or disability (*id.* at 100-102).

After exhausting his administrative remedies, Jordan filed the current suit on July 7, 2006. (Pl.'s Orig. Compl., Doc. 1). In his complaint, Jordan alleges Memorial Hermann discriminated against him based on his age, 45, and alleged disability, diabetes, and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), as amended, 29 U.S.C. § 791 *et seq.* (*See id.* ¶¶ 4, 9, 10, 12). Jordan also asserts a claim for intentional infliction of emotional distress. (*Id.* ¶ 11). Memorial Hermann has moved for summary judgment on all of Jordan's claims.

II.        Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact

for trial. *Celotex*, 477 U.S. at 323-24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should

be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

III.	Applicable Law

    A.	The *McDonnell Douglas* Framework

This is a case of age and disability discrimination based solely on circumstantial evidence. As such, Jordan's claims are governed by the tripartite burden-shifting scheme established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-04 (1973). Under the *McDonnell Douglas* test, if Jordan establishes a *prima facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to Memorial Hermann to articulate a legitimate, non-discriminatory reason for its employment action. *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). Memorial Hermann's burden is satisfied if it produces evidence, which "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)) (emphasis in original). If Memorial Hermann satisfies this burden and articulates a reason that can support a finding that its actions were nondiscriminatory, then "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out." *Id.* (citing *Hicks*, 509 U.S. at 510-511). Jordan must then introduce evidence creating a jury question as to whether the defendant was motivated by discriminatory animus. Plaintiff meets this burden by showing either (1) that defendant's articulated reason was pretextual (pretext alternative), or (2) that plaintiff's protected characteristic was a motivating factor in the decision (mixed motives alternative). *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). In determining whether summary judgment is appropriate, courts should consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148-49 (2000).

B.   *Prima Facie* Case of Age Discrimination

Under the ADEA, "it shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to establish a *prima facie* case of age discrimination, Jordan must show that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside his protected class, replaced by someone younger, or otherwise discharged because of his age. *Sandstad v. CB Richard Ellis*, 309 F.3d 893, 897 (5th Cir. 2002); *Rachid*, 376 F.3d at 309.

C.   *Prima Facie* Case of Disability Discrimination

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[3] To establish a *prima facie* case of disability discrimination, Jordan must show (1) he is disabled or regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. *See Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003) (citing *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000)).

D.   Retaliation

---

[3] Although it is unclear whether Jordan is in fact asserting a claim based on section 504 of the Rehabilitation Act (the statutory provision is mentioned only once in the "jurisdiction" section of his original complaint and not addressed at all in his summary judgment briefing), the court notes that claims based under section 504 incorporate the substantive standards of the ADA. 29 U.S.C. § 794(d).

Title VII of the Civil Rights Act of 1964 forbids an employer from "discriminat[ing] against" an employee because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a).

Plaintiffs with circumstantial evidence of retaliation must proceed under the *McDonnell Douglas* burden shifting framework.[4] *Septimus*, 399 F.3d at 608. Under this framework, Jordan may create an inference of discrimination by showing (1) that he engaged in an activity protected by Title VII; (2) that he suffered an adverse employment action, and (3) that there is a causal connection between the protected activity and the adverse employment action. *Id.* at 610; *see also Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191(5th Cir. 2001). If the plaintiff is successful, an inference of discrimination is created and the burden shifts to the defendant to articulate a non-retaliatory reason for the adverse employment decision. If the defendant articulates a legitimate reason, then the inference of discrimination falls away and plaintiff is left with the burden of proving that defendant's articulated legitimate reason was a pretext for retaliation. *Keelan v. Majesco Software Inc.*, 407 F.3d 332, 341 (5th Cir. 2005).

In determining whether an adverse employment action was taken as a result of retaliation, district courts must focus on the final decision maker. *Ackel v. Nat'l Communs., Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (internal quotations omitted). Any employer action that would be "materially adverse to a reasonable employee or job applicant" satisfies the "adverse employment action" requirement. *Burlington Northern & Santa Fe R.R. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

---

[4] According to Jordan, Cross's statements during the media incident, in which Cross allegedly told Jordan he could talk to the EEOC or anybody else," is "direct evidence" of retaliation. (Pl.'s Resp. 15, Doc. 14). The court disagrees. Direct evidence is evidence which, if believed, proves the fact without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). Cross's statement, if true, does not prove without inference or presumption that Memorial Hermann took an adverse action against Jordan as retaliation. As such, the court applies the *McDonnell Douglas* burden shifting framework to Plaintiff's retaliation claim.

IV.         Analysis

       (1)     Constructive Discharge

To satisfy his *prima facie* case of age and disability discrimination and retaliation, Jordan must demonstrate that he suffered an "adverse employment" action. Jordan relies exclusively on the theory of constructive discharge to satisfy the adverse employment action requirement. Thus, constructive discharge is the threshold issue.

Jordan bears the burden of showing constructive discharge. *See Jurgens v. Equal Employment Opportunity Commission*, 903 F.2d 386, 390-91 (5th Cir.1990). To establish a constructive discharge claim, Jordan must show that his working conditions were "so intolerable that a reasonable employee in [his] position would [have felt] compelled to resign." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 331 (5th Cir. 2004) (citations omitted); *see also Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 439-40 (5th Cir. 2005). Courts will consider the following factors when determining whether a reasonable employee would feel compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable that the employees's former status. *See Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir. 2001) (citing *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir. 2000)). Although "[p]roof is not required that the employer imposed these intolerable working conditions with the specific intent to force the employee to resign," *Jurgens*, 903 F.2d at 390, proof of "constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Brown*, 237 F.3d at 566 (citing *Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir. 1998)). Discrimination alone cannot

form the basis for a constructive discharge claim as a matter of law.  *See Boze v. Branstetter,* 912 F.2d 801, 805 (5th Cir. 1990).

In this case, Jordan claims that Cross harassed him because of his age and alleged disability thereby subjecting him to a hostile work environment that ultimately lead to his constructive discharge.  To establish a *prima facie* case of hostile work environment, an employee must show that (1) he belongs to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based on the employee's membership in the protected group, (4) the harassment affected a term, condition, or privilege of his employment, and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.[5]  *See Celestine v. Petroleos de Venez. SA*, 266 F.3d 343, 353 (5th Cir. 2001).  In determining whether a working environment is hostile or abusive, all circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 23 (1993).

The burden of establishing a hostile work environment is a heavy one.  "To survive summary judgment, the harassment must be 'so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place.'"  *Hockman*, 407 F.3d. at 326 (quoting *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 873 (5th Cir. 1999)).  In this respect, "[t]he alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents."  *Id.*  The "mere utterance of an epithet which engenders offensive feelings in a employee . . .does not sufficiently affect the conditions of employment to implicate Title VII."  *Harris*, 510 U.S. at 21 (internal quotations omitted).

---

[5] A plaintiff need not establish the fifth element if the alleged harasser is a supervisor with immediate or higher authority over the employee.  *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

Jordan claims Memorial Hermann subjected him to a hostile work environment based on his age and/or his alleged disability based on the following allegations: (1) Cross allegedly called Jordan a "cancer to the department," "the last of the Mohicans," "old-timer," "bad news," and a "bad influence"; (2) Cross allegedly told everyone in the security department that Jordan took a day off work because he had a "bump on his ass"; and (3) Cross allegedly made comments regarding Jordan's inability to handle his work. Jordan also asserts that Memorial Hermann's investigation into his 2003 and 2004 complaints were cursory and merely a pretext to find "no wrongdoing." (Pl.'s Resp. 15, Doc. 14). Finally, Jordan claims that he was subjected to a hostile work environment because Cross allegedly "berated and intimidated" him when Cross interviewed Jordan regarding the media incident in June 2005. (*Id.* at 13-14).

None of these incidents, individually or collectively, are sufficiently severe and pervasive to meet the stringent hostile work environment requirements. At most, Cross's alleged conduct is rude or offensive behavior and insufficient as a matter of law to support a hostile environment claim. *See McCoy v. City of Shreveport*, 492 F.3d 551, 558 (5th Cir. 2006) (finding defendant's conduct of throwing paper in the plaintiff's face and repeatedly entering the plaintiff's office to stare and laugh in mocking derision were "little more than occasional boorish remarks and childish horseplay" and not sufficiently severe or pervasive); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges.") (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). Jordan's hostile work environment claim must, therefore, fail as a matter of law.

As such, Jordan's claim of constructive discharge likewise fails. The alleged conduct was not sufficiently severe and pervasive to constitute harassment and, standing alone, would not compel a reasonable employee in Jordan's position to leave. *See McCoy*, 492 F.3d at 558

("unremediated harassment may create a hostile work environment and cause a constructive discharge, but only if it is 'severe or pervasive' and 'create[s] an environment that a reasonable person would find hostile or abusive'"). It is undisputed that Jordan was not demoted, did not suffer a reduction in salary or job responsibilities, and was neither reassigned to menial or degrading work, nor offered early retirement that would make him worse off whether accepted or not. To the contrary, Cross gave Jordan *more* responsibilities by promoting him to third shift supervisor. *See Brown,* 237 F.3d at 566; *see also Harvill*, 433 F.3d at 440. None of the factors identified by the Fifth Circuit to support a constructive discharge claim are present here. Moreover, success on a constructive discharge claim requires "a greater degree of harassment than is required for a hostile work environment claim." *Hockman*, 407 F.3d at 332 (citing *Benningfield*, 157 F.3d at 378). Because Jordan fails to establish a hostile work environment, he necessarily fails to establish that he was subjected to a working environment "so intolerable that a reasonable employee in [his] position would [have felt] compelled to resign." Accordingly, Jordan cannot avail himself of constructive discharge as an adverse employment action to satisfy his *prima facie* case of either his discrimination or retaliation claims. Summary judgment in Memorial Hermann's favor on these claims is therefore appropriate.

    (2)  Intentional Infliction of Emotional Distress

Jordan's final claim is for intentional infliction of emotional distress ("IIED") based on the alleged age and disability discrimination and retaliation. Under Texas law, an IIED claim is a "gap-filler" tort that is not intended to supplant or duplicate existing statutory or common-law remedies. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816-17 (Tex. 2005) (holding that statutory remedies for sexual harassment precluded emotional distress claim); *see also Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 450 (Tex. 2004). Because Jordan's IIED claim is

predicated on the same factual allegations making up his discrimination and retaliation claims, this claim must fail as a matter of law.

V.        Conclusion

        Accordingly, it is hereby

        **ORDERED** that Defendants' motion (Doc. 10) is **GRANTED**.

        SIGNED at Houston, Texas, this 11th day of December, 2007.

                                                                                    _____
                                                                                    MELINDA HARMON
                                                                                    UNITED STATES DISTRICT JUDGE